In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-23-00303-CV**
**IN THE INTEREST OF D.M. AND D.M.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 22-08-11390-CV**

## MEMORANDUM OPINION

Appellant "Cherie" appeals from an order terminating her parental rights to two children—eight-year-old "Drew" and two-year-old "Dennis."[1] After a trial, a jury found by clear and convincing evidence that statutory grounds existed for terminating Cherie's parental rights, that terminating her parental rights would be in the best interest of the children, and that the Department of Family and Protective Services ("the Department") should be appointed as the managing conservator of the

---

[1] To protect the identity of the children we use pseudonyms to refer to the mother, the children, family members, and foster parents. *See* Tex. R. App. P. 9.8(b)(2).

1

children.[2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (N), (O), (2). In a single issue, Appellant argues that there was no evidence that she knowingly placed or allowed the children to remain in conditions or surroundings that endanger their physical or emotional well-being. *See id.* § 161.001(b)(1)(D). As explained below, we affirm.

## Background

The Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship on August 31, 2022. An Affidavit in Support of Removal by a Department representative was filed at the same time, and the affidavit states that the Department received a report of neglectful supervision by Cherie—Drew's and Dennis's mother. The affidavit also states that Cherie and the two children were homeless, and Cherie had abused marijuana, amphetamine, methamphetamine, "crank,"[3] and crystal meth. In addition, the affidavit states that the report to the Department described Cherie's behavior as "erratic, unstable, emotional, tearful, and depressed." The affiant states that she talked with Cherie at a psychiatric hospital in

---

[2] The jury also found that the identity and location of the children's father or fathers were unknown, and the final Order of Termination terminated "the unknown father's" parental rights as well. Only the children's mother appealed from the final Order of Termination.

[3] According to the DEA, "crank" is a street name for methamphetamine. United States Drug Enforcement Administration, *Methamphetamine*, https://www.dea.gov/factsheets/methamphetamine (last visited January 5, 2024).

Conroe about the report of neglectful supervision, and Cherie said that her children were with her friend "Molly." The Department representative met with Molly, who reported that she had met Cherie about two weeks earlier at a restaurant in Magnolia, that she and her husband agreed to take care of the younger boy, Dennis, and that another friend of Cherie's, Masie Macintosh, was taking care of the older boy, Drew. Molly reported that drug paraphernalia, including pipes and needles, were found in Dennis's belongings.

The trial court appointed the Department as temporary managing conservator of Drew and Dennis on August 31, 2022. The trial court approved a family services plan setting forth the requirements Cherie must complete before the trial court would return the children to Cherie.

On April 13, 2023, Molly filed a Plea in Intervention as Dennis's caregiver, and she sought to be named Dennis's managing conservator. Therein, Molly alleged that she had been Dennis's caregiver, and that he had been subject to her actual care, control, and possession for at least six months not more than ninety days before the Department filed its Original Petition. Molly also alleged that Cherie had voluntarily placed Dennis in Molly's care. In an affidavit attached to the Plea, Molly alleged that she met Cherie at a restaurant on August 2, 2022, Cherie had been kicked out of the apartment where she had been staying, and Cherie was homeless. Molly gave Cherie her telephone number and told Cherie to call her if she needed anything.

3

Molly further alleged that a few days later, she called Cherie and arranged to meet Cherie at the hotel where Cherie was staying to deliver diapers, clothes, and a bottle. Upon arriving at the hotel, Molly learned that Cherie was being kicked out of the hotel. The next day when Molly picked up Cherie and Dennis and took them to eat, Molly learned that Cherie had left Drew "with a lady she had met at a gas station named [Masie Macintosh,]" and that Cherie voluntarily placed Dennis with Molly. According to the affidavit, based on what Cherie told Molly about how Cherie had been living, Molly concluded that Dennis "was not being cared for [and] had not experienced security, safety, and cleanliness" until Molly took him home. The affidavit further states that Molly took Cherie for medical care, where Cherie was referred to a psychiatric hospital, and then CPS was called, and a case was opened. Molly further alleged that Dennis had been in her home and under her care since August 2022. Molly subsequently filed a demand for a jury trial.

On July 5, 2023, about a month before trial, "Carla Sanders" filed a Petition in Intervention. Therein, Carla alleged she was the children's great aunt, she had "substantial past contact with the children[,]" and she sought to be appointed sole managing conservators of both Drew and Dennis. Carla also alleged that Cherie had "engaged in a history or pattern of child neglect." The record reflects that Carla lives

in Oklahoma.[4] The trial court granted Carla's Motion for Leave to File Petition in Intervention as to Drew only.

In January of 2023, the Court Appointed Special Advocate requested that Drew be moved from his current caregiver (Masie Macintosh) to a licensed foster care home because of the caregiver's financial limitations. In a status hearing in May of 2023,[5] the Department told the trial court that Drew had been placed in a foster home (Malorie and Bob Smith), and Dennis remained with Molly.

Evidence at Trial

Testimony of Katrina Petties

Katrina Petties testified that she is an investigator with the Department and assigned to this case. Petties recalled that when she first met Cherie, the children's mother, in August of 2022, Cherie was in a psychiatric hospital. According to Petties, Cherie told her she had lost her job at a convenience store, she was diagnosed with depression and anxiety, and her children were with Molly Barton. Petties also testified that Cherie told her the children "had no fathers." Petties testified that Cherie told her that, upon discharge from the hospital, she was going to a center that was "kind of like a homeless shelter[]" and that she had previously been living in a

---

[4] The record reflects that Cherie lived in Oklahoma at some time before this case began.
[5] A docket entry dated March 2, 2023, states that Drew was placed in a foster home at that time.

hotel. Cherie also told Petties that she had been using "uppers and downers[]" as recently as a couple of days before Petties met Cherie. Cherie also told Petties that she had used drugs while she was pregnant. Petties also testified that Cherie disclosed that Dennis had a discoloration or mark on his abdomen where "her sister had been watching him and she picked him up too hard."

According to Petties, she went to see the children the same day she talked with Cherie. Petties testified that Dennis was with Molly Barton, whom Cherie had met at a restaurant a couple of weeks earlier. Petties further testified that Cherie contacted Molly to say she had been kicked out of a friend's house and Cherie did not have anywhere for her children to go. Petties explained that she met Drew the same day, who was with "another caregiver[]" who knew Molly.

Petties testified that Molly contacted her around early September 2022 to say that Cherie was getting out of the hospital and wanted her children back, and it was then that the Department decided to remove the children due to Cherie's drug use and a reason-to-believe finding for neglectful supervision and to seek temporary custody. Petties explained that Drew stayed with Molly Barton, and Dennis stayed with Masie Macintosh because "the children were already settled."

Petties testified that the Bartons provided her with photos of Dennis's baby bag, which were admitted into evidence. Petties identified drug paraphernalia,

including a pipe, in the photos of the baby bag, and she agreed the photos contributed to the reason-to-believe finding of neglectful supervision.

On cross-examination, Petties testified that she worked as an investigator in this case for about two weeks. She also testified that, other than the mark on Dennis's abdomen, the children did not have any unexplained injuries, they were appropriately clothed and fed, and they did not appear to have any untreated medical or dental conditions. She agreed that she observed the Bartons' home and did not have concerns about it, nor did she observe any dangerous conditions in their home. Petties also did not have concerns about the Macintosh home, and she agreed that Cherie left the children with responsible adults.

Testimony of Carla Sanders

Carla Sanders testified that she lives in Oklahoma, and she is Dennis's and Drew's great aunt. Carla further testified that she had driven from Oklahoma four times in connection with this case—once a month for the four months before trial. Carla recalled that she saw the boys at the CPS office, and she had not seen Drew do anything that would possibly harm Dennis nor was she concerned for Dennis to be around Drew.

According to Carla, Drew and Cherie lived with her for about one and a half or two years before Cherie moved to Texas, and Cherie "was there for several months and [then she] would leave for a few weeks and come back." Carla recalled

7

that Drew had lived in at least four homes when he was in Oklahoma. Carla agreed that Cherie has a substance abuse problem, she saw Cherie continuing to "smoke and other things" while she was pregnant, she had seen Cherie act "unusual" and "erratic," and Cherie would "[f]ly off the handle, get mad at things, [and] not be able to control herself[]" and would yell at Drew. Carla said she was concerned for Drew based on Cherie's behavior and was concerned that Cherie would ignore Drew. Carla recalled that CPS became involved at one point, but they gave the children back to Cherie. Carla testified that Cherie was able to provide the children a safe home, but "[i]t might not have always been stable[.]" Carla agreed there had been two judgments against Cherie for child neglect of Drew and for public intoxication in 2016. A copy of a 2017 Oklahoma judgment against Cherie for child neglect and public intoxication was admitted into evidence.

Carla testified that she was asking for managing conservatorship of Drew, but her home study did not pass because of her and her husband's income, her husband's health problems, and because she has a "medical marijuana card" for her anxiety.

Carla further testified that, even when Cherie was at Carla's home, Carla and her husband were caring for Drew and that, about every other month, Drew would go to Carla's home without Cherie. Carla also testified that one of her big concerns was that Drew felt like he had to take care of his brother, Dennis, and she wanted Drew to be able to enjoy his childhood. Carla further testified that she speaks with

8

Cherie periodically, and that she knew Cherie was pregnant with another child at the time of trial. According to Carla, in 2016 Drew was in the Oklahoma Department's custody for a few days after he was removed from Cherie's home.

Testimony of Molly Barton

Molly Barton testified that she met Cherie at a restaurant in July of 2022. Molly recalled that Cherie appeared anxious, nervous, emotionally upset, and "not taken care of." Molly testified that she was concerned for Cherie and her children, and she gave Cherie her phone number and told Cherie she would help. According to Molly, Cherie reached out to her a few days later and Molly gave Cherie clothes and food. At some point, it was decided that Cherie would "go into rehab[.]" Drew was already staying with another family, and Molly agreed to watch Dennis. According to Molly, Cherie and her boys had been staying with a friend, but the friend kicked them out after a disagreement, and then Masie let the boys stay with her family. Molly testified that Cherie told her she met Masie at a gas station. Molly further testified that, during the case and while she cared for Dennis, Drew would come over and stay the night.

Molly testified that there was an "incident" when Cherie was at the psychiatric hospital when Cherie got upset because CPS was involved. Molly recalled that CPS visited her home and asked if she could protect Dennis. Molly testified that she did not contact CPS or law enforcement when she first met Cherie at the restaurant

9

because "[s]he had a safe place to go[,]" but she felt concerned enough to give Cherie her phone number.

Molly testified that, when Drew was staying with Masie, the boys would see each other every week until COVID interrupted the visitation schedule. According to Molly, she was asked if she could also take Drew in addition to caring for Dennis, but she said she could not, and Drew was moved to a licensed foster home in February of 2023. Molly testified that she had concerns about Drew because she had seen him "run over" or push Dennis during visitations and because she thought Drew was "oversexualized" and "really curious wanting to play with [Dennis] down there[]" when Dennis was being changed. Molly also testified she was concerned that Drew would scream in Dennis's face and grab his hair, and she was concerned about Drew being with Dennis unsupervised. Molly testified that, at the time of trial in August of 2023, Dennis had been living in her home for a year, Drew was living with his foster mother, Malorie, and Drew had been in three homes since August of 2022.

Molly agreed she was responsible for Dennis's medical care and getting him evaluated for Early Childhood Intervention. According to Molly, she let the Department know "immediately" when she noticed that Dennis showed signs of being developmentally behind. She also agreed that Dennis needed tubes in his ears, but they were still waiting for a date for the procedure at the hospital.

10

Testimony of John Barton

John Barton testified that, at the time of trial, he and his wife were taking care of Dennis, and they wanted to be his sole managing conservators. John testified that two granddaughters (ages 6 and 10) also live in his home, that the two girls love Dennis, and they would be "heartbroken" if Dennis were to be taken away.

John testified that he had concerns about Dennis being around Drew because of Drew "being sexually active[]" and because of anger issues, such as grabbing Dennis's hair and screaming. John also testified that Dennis was a little bit behind developmentally but "he's catching up." John agreed that Dennis is sick quite often as well. He explained that he declined to take Drew into their home because "he acts out sexually[]" and because John and his wife also have two girls in their home.

Testimony of Malorie Smith

Malorie Smith testified that she and her husband are Drew's foster parents, Drew was placed in their home February 21, 2023, and Drew had been with them for about six months at the time of trial. According to Malorie, they knew that Drew has a younger brother who was placed with someone else. Malorie testified that when she and her husband were asked whether they would be willing to take both boys, they said yes, and they are willing to adopt both boys. Malorie testified that she and her husband also have two biological children.

Malorie described Drew as sweet, "supersmart[,]" loving, and wanting attention. In Malorie's opinion, Drew's maturity level was "above where a normal 8-year-old would be." Malorie testified that Drew's transition into their home was "easy[,]" and she did not think Drew had behavior issues. Malorie also testified that when Drew first came into their home, there was "a lot of arguing[]" and Drew can be stubborn, but they worked through it. According to Malorie, Drew goes to therapy once a week and to speech therapy twice a week, but he does not have special needs. Malorie testified that she had seen Drew and Dennis together during visitations, but she has not seen anything concerning between the two boys. Malorie testified that Drew "sees a therapist [be]cause it's required by CPS, but he doesn't have any emotional issue there." Malorie testified that she had not seen any sexual behaviors by Drew nor any inappropriate behavior.

Malorie testified that, as a family, they play games, swim in their pool, and go to drive-through safaris. Her husband plays video games with Drew, and Drew is involved with football, swimming, and various sports camps. Malorie also testified that Drew feeds their animals with their daughter, who is involved in FFA.

Testimony of Shaunta Holmes

Shaunta Holmes testified that since September 30, 2022, she has been the conservatorship caseworker for the Department in this case. According to Holmes, when the Department became involved with the children in this case, Cherie had

12

already placed Drew and Dennis with different caregivers, so the Department did not put the children together. Holmes testified that she asked Cherie to give the Department the name of the father of each child, but Cherie did not provide any names. Holmes also testified that a search of the paternity registry did not show that anyone had registered as the father of either child.

After some complaints and issues about finances were made by Drew's initial caregiver, in February 2023, Drew was moved into a foster home. Holmes testified that Dennis was not placed with Drew in the foster home because Drew needed to get adjusted before adding another child in that home.

A court-ordered family service plan for Cherie was admitted into evidence. Holmes testified that Cherie was not ever able to prove any employment or housing, and Holmes did not know where Cherie was living. According to Holmes, her last contact with Cherie was by text about five or six months before trial. Holmes also testified that Cherie was required to complete a drug and alcohol assessment and follow recommendations, and to obtain substance abuse services, but Cherie did not do these things. Holmes further testified that the service plan required Cherie to be drug tested, that Holmes sent Cherie for random drug tests during the case, but that Cherie had not completed a drug test. In addition, Holmes testified that Cherie was required to participate in mental health services, including psychiatric and psychological evaluations, individual counseling, and follow-through on

13

recommendations, but she did not complete these services. Holmes testified that Cherie was allowed to visit the boys during the case, but Cherie did not participate in any visitations with her children.

Holmes testified that she was not aware of any sexualized behavior by Drew, nor had she received any such complaints about such behavior. Holmes also testified that she had never been concerned for Dennis's safety around Drew, that she had observed the boys to be bonded, loving, and caring, and that on one occasion when the boys were together on a visitation, she saw Drew comfort Dennis. Holmes was aware that Drew was seeing a psychologist. Holmes agreed that Drew had lived in two homes since the Department became involved in this case and that he lived in five or six homes in Oklahoma. Holmes testified that the Department referred Drew for children's services, but he did not start participating in them until he was placed with foster parents in February of 2023.

Holmes agreed that in about October of 2022, she asked the Bartons to have an Early Childhood Intervention evaluation for Dennis, which revealed he has a developmental delay of several months. Holmes also testified that at some point, Dennis started receiving services but later stopped, and he was not receiving services at the time of trial. She had not been able to get medical records from the Bartons, although she had requested them. Holmes testified that Drew received individual therapy and trauma behavioral therapy.

Holmes testified that it was in the children's best interest for Cherie's parental rights to Drew and Dennis be terminated due to her noncompliance with the court-ordered service plan, her failure to participate in visitation of the children, and her failure to demonstrate to the Department that she can provide a safe, stable, and drug-free environment for her children. According to Holmes, the Department's plan was to have the boys adopted together in a home.

Testimony of the Court Appointed Special Advocate

The Court Appointed Special Advocate ("CASA") testified that she had been assigned to this case for both children from the beginning. She visited the children on a weekly basis until she was injured in the summer of 2023, when her supervisor took over. The CASA testified that Dennis is "always happy[,]" and he claps his hands and sings. The CASA testified that Drew is very smart and very kind, and since being at the foster parents' (the Smiths) home, he has "settled down" and "opens up" more. The CASA testified that she was told that one time, on a family trip, Drew tried to get the Bartons' youngest daughter to go into the restroom with him. In the CASA's opinion, Cherie's parental rights to the boys should be terminated because she "has not done any of the plan set forth for her."

Testimony of CASA Supervisor

The CASA Supervisor had supervisory involvement in this case for both children for the entire time the case was pending. The CASA Supervisor stepped in

15

for two months because the CASA had an injury. The CASA Supervisor testified that Drew is very smart, and he loves to play board games and sports. The CASA Supervisor testified that Dennis is sweet, playful, and "a little bit shy at first[.]" According to the CASA Supervisor, he saw Cherie at the beginning of the case through court hearings, and she thought Cherie "seemed under the influence." The CASA Supervisor did not recommend placing Drew with the Bartons because he thought "there's a negative vibe that is always directed towards" Drew. As for a placement with Carla Sanders and her husband, the CASA Supervisor was concerned about their health and the home study was denied. The CASA Supervisor testified that, since Drew had been with the foster parents, Drew has come out of his shell. The CASA Supervisor had no concerns about Drew being hypersexualized.

The CASA Supervisor agreed that Cherie's parental rights to Drew and Dennis should be terminated because Cherie has been unable to provide a stable environment, concerns about her drug use, and her failure to try to see the children during the case. The CASA Supervisor had seen both boys together at the foster parents' home, and she saw them being playful and affectionate with one another.

Photos of drug paraphernalia found in Dennis's baby bag as photographed by Molly Barton and given to the Department were admitted into evidence. Cherie did not testify nor was she present for the trial. At the close of the Department's case, Cherie's attorney moved for a directed verdict on subsections D and E on

endangerment because there was no evidence that the environment the children were in was dangerous. The trial court denied the motion.

The jury found there was clear and convincing evidence that Cherie had knowingly placed or knowingly allowed Drew and Dennis to remain in conditions or surroundings that endanger their physical or emotional well-being; that Cherie had constructively abandoned Drew and Dennis after the Department was appointed temporary managing conservator; that Cherie failed to comply with the court-ordered service plan as to both Drew and Dennis; that termination of Cherie's parental rights was in Drew's and Dennis's best interest; that Drew's and Dennis's fathers were unknown; and that the Department should be appointed managing conservator of Drew and Dennis. The jury also found that there was not clear and convincing evidence that Cherie had engaged in conduct or knowingly placed Drew and Dennis with persons who engaged in conduct that endangered the boys' physical or emotional well-being. The jury further found that John and Molly Barton should not be appointed possessory conservator of Dennis. The trial court adopted the jury's verdict and ordered Cherie's and the unknown father's parental rights terminated and the Department to be managing conservator for Drew and Dennis. The trial court signed the Order of Termination on September 5, 2023. Cherie timely filed her notice of appeal.

17

Issue

In a single issue on appeal, Appellant argues that no evidence was presented that she knowingly placed or allowed Drew and Dennis to remain in conditions or surroundings that endanger their physical or emotional well-being.[6] According to Appellant, there was no testimony about the conditions in which the children were living when they lived with her, and the evidence also showed that the children were living with two separate caregivers and that CPS had no concerns about these caregivers. Appellant also argues that, although there was evidence that she had "drug paraphernalia" when she provided a baby bag to a caregiver, there was no evidence that the items were tested, that they contained illegal substances, or that she had used any substances while in possession of the children.[7]

Standard of Review and Applicable Law

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will

---

[6] Essentially, Mother challenges the jury's finding based on section 161.001(b)(1)(D) of the Texas Family Code.

[7] Although Mother's brief states her issue as a "no evidence" challenge, her cited legal authorities and argument address the legal and factual sufficiency of the evidence. Therefore, we will treat her issue as challenging the legal and factual sufficiency of the evidence as to subsection D. *See Perry v. Cohen*, 272 S.W.3d 585, 588 (Tex. 2008) ("'[W]e liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants.'") (quoting *El Paso Nat. Gas v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999)).

18

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In a suit to terminate the parent-child relationship, the Department as the movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved the disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

19

factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

"In reviewing termination findings for factual sufficiency, a court of appeals must give due deference to a jury's factfindings[] and should not supplant the jury's judgment with its own[.]" *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal citations omitted). Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony, and they may choose to believe one witness and disbelieve another. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). "All evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *see also In re R.H.W. III*, 542 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Under subsection D, the Department had the burden to prove, by clear and convincing evidence, that Cherie knowingly placed or allowed Drew and Dennis to remain in conditions or surroundings that endangered their physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(D). The term endanger means "'expose to loss or injury; to jeopardize.'" *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting "endanger," Webster's New Twentieth Century Dictionary of the English Language 599 (1976)). Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-

20

being. *See In re J.O.A.*, 283 S.W.3d at 345 n.4 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). "Subsection D requires the endangerment to the child to be the direct result of the child's environment." *See In re J.H.*, No. 09-20-00056-CV, 2020 Tex. App. LEXIS 6189, at *34 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 Tex. App. LEXIS 8659, at *14 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection D endangerment analysis. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *34 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Under subsection D, termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and

21

disregarding the risk is enough to show endangering conduct. *See In re J.H.*, 2020 Tex. App. LEXIS 6189, at *35.

A pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *See In re J.O.*, No. 09-21-00341-CV, 2022 Tex. App. LEXIS 1769, at *31 (Tex. App.—Beaumont Mar. 17, 2022, pet. denied) (mem. op.); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being). A parent's continued drug use when the custody of her child is in jeopardy supports a

finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). Further, a factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because she was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Analysis

In this case, in addition to finding that termination of Cherie's parental rights was in Drew's and Dennis's best interest, the jury found there was clear and convincing evidence to support three statutory bases for termination: subsections D (endangerment), N (constructive abandonment), and O (failure to comply with a court-ordered service plan). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (N), (O), (2). Cherie only appeals the jury's finding as to subsection D. Ordinarily, only one statutory basis for termination is necessary to sustain a trial court's order terminating parental rights. *See In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, the Texas Supreme Court has held that, when a parent has appealed a finding on subsections D or E, due process requires that an appellate court review the issue even when another statutory ground is sufficient for termination because of the potential consequences for parental rights

23

to a different child in a later proceeding. *See In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019).

Katrina Petties, an investigator for the Department, testified that Cherie told her the children had "no fathers[,]" she had lost her job, and she was diagnosed with depression and anxiety. At the time, Cherie was in a psychiatric hospital, and upon release, Cherie planned to go to a homeless shelter. Cherie also told Petties that she had given her children to two women she had just met. Petties testified that Cherie told her she had been using "uppers and downers[]" and she had also used drugs when she was pregnant. Petties also testified that Molly Barton had given her photos of Dennis's baby bag that Molly received from Cherie, and inside the bag was drug paraphernalia, including a drug pipe.

After one of the caregivers (Masie) had financial issues taking care of Drew, Drew was placed with a foster family. Shaunta Holmes, the caseworker, testified that Cherie had not completed any of the services in her court-ordered service plan and she had not visited the boys at all during the case. Holmes also testified that she had referred Cherie for random drug tests during the case, but that Cherie had not completed any drug tests. Carla, the great aunt to Drew and Dennis, testified that she had witnessed Cherie act erratic and volatile, and that Cherie had not always been able to provide a stable home for the boys. Carla also testified that there were judgments in Oklahoma against Cherie for child neglect and public intoxication.

24

Molly Barton and Molly's husband, who cared for Dennis, testified that Cherie asked Molly to take Dennis after she met Cherie in a restaurant and Cherie appeared emotionally upset and "not taken care of." Molly also testified Cherie had asked another acquaintance (Masie) to take care of Drew, but Cherie had just met Masie at a gas station.

Molly testified that Dennis showed signs of being developmentally behind and needed tubes in his ears. Molly's husband John testified that he was concerned about Drew being around Dennis because Drew was "sexually active[,]" Drew had anger issues, and Drew sometimes would scream at Dennis and pull his hair. The caseworker testified that Drew had lived in two homes since this case began and he had lived in five or six homes in Oklahoma. She also testified that Drew was receiving individual therapy and trauma behavioral therapy. She testified that she was not aware of sexualized behavior by Drew. The caseworker also testified that Dennis showed signs of developmental delay.

Based on the testimony and evidence in this case, the jury could have concluded that Cherie's conduct subjected Drew and Dennis to a life of uncertainty and instability that endangered their physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345 n.4. Evidence of Cherie's drug use and emotional and housing instability prior to and during the case reflect a course of conduct from which the jury could conclude that Cherie endangered the children's emotional and

physical well-being. *See In re M.C.*, 2019 Tex. App. LEXIS 2961, at \*\*15-16. The jury could also reasonably have inferred that Cherie's failure to submit to court-ordered drug tests indicated that she was avoiding testing because she was still using illegal drugs. *See In re J.O.*, 2022 Tex. App. LEXIS 1769, at \*\*31-32; *In re E.R.W.*, 528 S.W.3d at 265.

Viewing the evidence in the light most favorable to the jury's findings, we conclude that the jury could reasonably have formed a firm belief or conviction that Cherie, through her acts or omissions, knowingly placed or knowingly allowed Drew and Dennis to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Further, in light of the entire record, we conclude the disputed evidence the jury could not reasonably have credited in favor of its endangerment finding is not so significant that the jury could not reasonably have formed a firm belief or conviction that Cherie endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266. Therefore, we conclude that the evidence was legally and factually sufficient to support the jury's verdict and the trial court's Order of Termination. *See id.*; *In re J.O.*, 2022 Tex. App. LEXIS 1769, at \*\*35-36; *In re J.L.V.*, 2020 Tex. App. LEXIS 2070, at \*\*36-37. We overrule Appellant's issue.

Having overruled Appellant's issue, we affirm the trial court's Order of Termination.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on December 22, 2023
Opinion Delivered January 25, 2024

Before Golemon, C.J., Horton and Johnson, JJ.